# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 13-cv-5438(JFB)(GRB)

DEBORAH MOSS AND WILLIAM HILLICK,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

VERSUS

BMO HARRIS BANK, N.A., FIRST PREMIER BANK, AND BAY CITIES BANK,

Defendants.

**MEMORANDUM AND ORDER**
June 9, 2014

JOSEPH F. BIANCO, District Judge:

Plaintiffs Deborah Moss and William Hillick bring this action alleging violations of the Racketeer Influenced and Corrupt Organizations Act,[1] 18 U.S.C. § 1962, on behalf of themselves and a prospective class which they define as "[a]ll natural persons within the state of New York whose accounts were debited via an ACH entry originated by either BMO Harris Bank, N.A., First Premier Bank, or Bay Cities Bank as an ODFI on behalf of an Illegal Online Payday Lender in repayment of a loan which was illegal under New York law." (Am. Compl. ¶ 109.)

In short, this action involves civil RICO claims based on defendants' alleged role in facilitating high-interest payday loans,[2] which have been outlawed in several states but remain available from online lenders. (Am. Compl. ¶¶ 4-5.) The two named plaintiffs are parties to five loan agreements with various online lenders ("the lenders"), and each agreement contains an arbitration clause. None of the arbitration clauses explicitly mentions defendants by name, nor are defendants signatories to any of the loan agreements. In other words, plaintiffs have elected not to sue their contractual counter-parties, the lenders, but instead have sued defendants, who facilitated the funds transfers connected with plaintiff's loans.

Although defendants are not parties to the loan agreements, the agreements reflect

---

[1] The Amended Complaint also includes various state-law claims, the nature of which do not affect the Court's analysis of the motions to compel arbitration.

[2] The Amended Complaint defines a payday loan as "a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck." (Am. Compl. ¶ 27.)

their involvement in the loans in two ways. Each agreement contains a provision describing the function that defendants ultimately performed: an authorization section in which plaintiffs permitted the lender to initiate electronic funds transfers from plaintiffs' bank accounts. In addition, the arbitration provisions in each agreement state that plaintiffs must arbitrate not only with the lenders, but also with the lenders' "agents" and "servicers." Defendants argue that they are agents and servicers within the meaning of the arbitration provisions, and that therefore plaintiffs should be estopped from avoiding arbitration with them. Plaintiffs argue that the arbitration provisions did not place them on notice that they were consenting to arbitrate with defendants.

For the reasons discussed below, the Court concludes that defendants may enforce the arbitration provisions against plaintiffs, because the broad arbitration provisions and the specific authorizations of electronic funds transfers made it foreseeable that entities like defendants, who are involved in those transfers, would be among the third parties with whom plaintiffs agreed to arbitrate. Accordingly, the motions to compel arbitration are granted, and this case is stayed. The Court does not reach the motions to dismiss at this juncture.[3]

---

[3] The Court is aware that defendants and counsel for plaintiffs are involved in similar cases around the country, and defendants have cited one case in which another federal court likewise granted motions to compel arbitration. *See Elder v. BMO Harris Bank*, Civil No.-JFM-13-3043, 2014 WL 1429334 (D. Md. Apr. 11, 2014); *but see Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2014 WL 911950, at *2 (M.D.N.C. Mar. 10, 2014) (denying motions to compel arbitration because of questions concerning whether loan agreements presented were the same ones referred to in the complaint).

I. BACKGROUND

A. Factual Background

The following facts are taken from the complaint. The Court assumes these facts to be true for the purpose of deciding this motion, and construes them in the light most favorable to plaintiffs, the non-moving party.

This case arises out of five online payday loans. Moss applied for and received three such loans: one for $350 on June 17, 2010, one for $400 on October 15, 2010, and one for $1,000 on May 8, 2013. (Am. Compl. ¶¶ 87, 90, 94.) Hillick applied for two online payday loans: one for $550 on September 5, 2012, and one for $750 on June 1, 2013. (*Id.* ¶¶ 99, 104.) Each of these loans was made pursuant to a written agreement containing an arbitration provision and an authorization for the lender to initiate electronic funds transfers.[4] Those provisions are discussed in more detail below. Plaintiffs allege that the interest rate on these loans was 30%, with annual interest rates between 438% and 780%. (*Id.* ¶¶ 88, 91-92, 95-96, 100-01, 105-06.)

The electronic funds transfers involved in these five loans were performed using the Automated Clearing House ("ACH") network, "a processing system in which financial institutions accumulate ACH

---

[4] Plaintiffs argue that the presence of the authorizations creates a question of fact, specifically whether the loans were illegally conditioned on plaintiffs' authorizing the fund transfers. Plaintiffs cite no authority in support of that argument, nor do they identify any fact or evidence suggesting that the loans were so conditioned. Nothing on the face of the authorizations suggests that the loans were illegally conditioned upon them, and thus the Court concludes that the authorizations raise no question of fact.

transactions throughout the day for later batch processing." (*Id.* ¶ 35.) The transactions are the debits and credits necessary for an exchange between two parties, and they are performed by entities known as Originating Depository Financial Institutions ("ODFIs"), which are banks belonging to the ACH network who transmit the funds from one party to the other party's bank. (*Id.* ¶¶ 36-40.) The organization that provides governing rules for the ACH network refers to ODFIs as "the gatekeepers of the ACH Network." (*Id.* ¶ 45.)

Defendants are the ODFIs that originated the five loan transactions in this case. (*Id.* ¶¶ 89 (First Premier); 93 (BMO); 97 (Bay Cities); 103 (BMO); 107 (BMO).) Plaintiffs allege that defendants received fees for performing the origination of these loans, and that they are able to charge the lenders higher fees than for other ACH transactions, because of the risks inherent in online payday lending. (*Id.* ¶¶ 79-80; 98; 108.)

B. Procedural History

Plaintiffs filed the complaint in this action on September 30, 2013, and filed an Amended Complaint on January 3, 2014. On February 3, 2014, defendants filed separate motions to compel arbitration and motions to dismiss. Plaintiffs responded in opposition on March 3, 2014, and defendants replied in further support of their motions on March 17, 2014. The Court heard oral argument on April 9, 2014.

II. STANDARD OF REVIEW

"In a typical motion to compel arbitration, the Court would apply a standard similar to that of a summary judgment motion . . . and some discovery may be allowable or necessary." *Lismore v. Societe Generale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012) (citing *DuBois v. Macy's East Inc.*, 338 F. App'x 32, 33 (2d Cir. 2009)). However, when a court considers the motion to compel before discovery has taken place, and in the context of a motion to dismiss, it treats the allegations in plaintiffs' complaint as true. *Id.* (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 379 n.1 (2d Cir. 2008)); *see also Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 23 (1983) (noting "Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible. . . . with only restricted inquiry into factual issues.").

The following discussion is based upon the allegations in the Amended Complaint, as well as the text of the five loan agreements in this case. Those agreements are not attached to the Amended Complaint, but they are referred to throughout, including in allegations that mention the precise dates and amounts reflected in the loan agreements. (*See* Am. Compl. ¶¶ 87, 90, 94, 99, 104.) Therefore, the Court concludes that the five loan agreements are integral to the Amended Complaint, and proper for consideration on these motions. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument . . . incorporated in it by reference . . . [or] where the complaint relies heavily upon [the instrument's] terms and effect, which renders the document 'integral' to the complaint."). No party disputes that conclusion; in fact, each has submitted the loan agreements as exhibits during the litigation of these motions.

3

III. DISCUSSION

The Second Circuit has observed that "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied." *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (internal quotation marks omitted). "'Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Id.* at 235 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). Although plaintiffs argue that the strong federal policy in favor of arbitration does not apply here, because this case does not involve the scope of an arbitration clause, but instead involves which parties are bound to it, the Second Circuit has noted these same "bedrock principles of arbitration law" even in estoppel cases. *See Ross v. Am. Exp. Co.*, 547 F.3d 137, 142 (2d Cir. 2008).

Still, plaintiffs are correct that "[a]rbitration . . . is a matter of consent, not coercion." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989). Thus, "[w]hile the FAA expresses a strong federal policy in favor of arbitration, the purpose of Congress in enacting the FAA was to make arbitration agreements as enforceable as other contracts, *but not more so.*" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (internal quotation marks and citations omitted) (emphasis in original).

Here, of course, plaintiffs did not contract with defendants—they contracted with the lenders, who are not parties to this action.[5] Nonetheless, the Second Circuit has described the "basic doctrine" in this situation as follows:

> Our cases have recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.

*Ross*, 547 F.3d at 144 (internal quotation marks and further citation omitted).[6]

---

[5] Bay Cities argues that the very question of plaintiffs' obligation to arbitrate with the non-signatory defendants should be decided by the arbitrator. However, in the primary case on which Bay Cities relies, *Contec Corp. v. Remote Solution, Co., Ltd.*, the Second Circuit still employed the same intertwined-ness test used herein to determine if the parties' relationship was close enough to justify compelling arbitration, even of the question of arbitrability. *See* 398 F.3d 205, 209 (2d Cir. 2005) ("In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement. . . . A useful benchmark for relational sufficiency can be found in our estoppel decision in *Choctaw* . . . where we held that the signatory to an arbitration agreement is estopped from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." (internal quotation marks and citation omitted)). Thus, the Court must still determine whether plaintiffs are estopped from avoiding arbitration, even if arbitrability must be determined by the arbitrator.

4

⁶ In *Arthur Andersen LLP v. Carlisle*, the Supreme Court held that state contract law provides the "traditional principles . . . [that] allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." 556 U.S. 624, 631 (2009). Based on that holding, plaintiffs suggest that the relevant state law in this case would be the law of the tribal and foreign nations in which the lenders are based, and which are mentioned in the loan agreements. However, as the proponents of tribal and foreign law, plaintiffs would have to show that it conflicts with New York law on the question of estoppel. *See Dornberger v. Metro. Life Ins. Co.*, 961 F. Supp. 506, 530 (S.D.N.Y. 1997) (assigning burden to party invoking foreign law and noting "[i]t has been held that a court may choose to apply the law of the forum state where the parties have not adequately advised the court of foreign law" (citing *Gehling v. St. George Univ. Sch. of Med.*, 698 F. Supp. 419, 422 (E.D.N.Y. 1988))). Plaintiffs have not attempted to make that showing; in fact, they explicitly "take no position on the applicability of [foreign and tribal] law," other than to note that defendants did not address it in their motions. (Pl. Mem. Opp. to BMO at 10; Pl. Mem. Opp. to Bay Cities at 10; Pl. Mem. Opp. to First Premier at 10.) Simply raising the choice-of-law question is insufficient, especially since the loan agreements appear to exempt the arbitration provisions from the application of tribal or foreign law. (*See* Pl. Ex. 1 at 645 (specifying that FAA governs the arbitration provision and that tribal arbitration law only governs if a court concludes that the FAA does not apply); Pl. Ex. 2 at 659 (same); Pl. Ex. 3 at 688 ("This Note (other than the Arbitration Provision) is governed by the laws of St. Vincent and the Grenadines."); Pl. Ex. 4 at 366 (providing for the FAA to govern arbitration, and for the contract to be governed by federal law and the unspecified law of the lender's location); Pl. Ex. 5 at 413 (same).) Accordingly, the Court has applied New York law "to the extent it is not preempted by the Federal Arbitration Act." *Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 13 (2d Cir. 2012); *see also Gov't Emps. Ins. Co. v. Grand Med. Supply, Inc.*, No. 11 Civ. 5339(BMC), 2012 WL 2577577, at *3 (E.D.N.Y. July 4, 2012) (collecting cases showing that the Second Circuit's estoppel decisions are in accordance with New York law, and noting that "the distinction between federal law and New York law on this issue appears to be insignificant"); *Belzberg v. Verus Inv. Holdings Inc.*,

The Second Circuit has been careful to note that its estoppel doctrine does not mean that "whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d Cir. 2008). In *Sokol* and in *Ross*, the Second Circuit rejected estoppel claims by non-signatories seeking to compel arbitration because the non-signatory was simply too remote from the contract; in other words, when the signatory consented to arbitrate with one party, it could not have foreseen the involvement of the non-signatory, and therefore could not be said to have consented to arbitrate with the non-signatory. *See Sokol*, 542 F.3d at 362 (rejecting claim of estoppel where non-signatory's only relationship to contract was as a third-party wrongdoer); *Ross*, 547 F.3d at 148 ("[P]laintiffs have it precisely correct when they assert that there [was] no reason for someone signing up for a Chase Visa card, for example, to believe that he (or she) was entering into any kind of relationship with [Amex]." (internal quotation marks omitted and alterations in original)).

On the other hand, and in accordance with the strong federal policy in favor of arbitration, many cases in this circuit have accepted claims of estoppel and allowed non-signatories to compel arbitration. *See, e.g.*, *Ross*, 547 F.3d at 144-45 (collecting cases); *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 479 (S.D.N.Y. 2013) (compelling arbitration where non-signatories were explicitly and implicitly mentioned in contract); *Choctaw Generation*

21 N.Y.3d 626, 630 (2013) (applying "estoppel theory, derived from federal case law, to abrogate the general rule against binding nonsignatories").

*Ltd. P'ship v. Am. Home. Assur. Co.*, 271 F.3d 403, 406-08 (2d Cir. 2001) (compelling arbitration where non-signatory's dispute with signatory to separate contract was "linked textually" to the separate contract containing an arbitration provision).[7]

Since *Ross* clarified the "basic doctrine" quoted above, district courts within this circuit have formulated "a two-part intertwined-ness test,[8] under which they examine whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party." *A2P*, 972 F. Supp. 2d at 476 (internal quotation marks and citations omitted); *see also Lismore v. Societe Generale Energy Corp.*, No. 11 Civ. 6705(AJN), 2012 WL 3577833, at *7 (S.D.N.Y. Aug. 17, 2012) (collecting cases). The Court considers each of these requirements in turn.

(1) Arising Under the Loan Agreements

Although plaintiffs argue that their causes of action do not arise under the loan agreements, the Court disagrees. Every one of plaintiffs' causes of action requires the conclusion that the loan agreements are invalid. (*See* Am. Compl. ¶¶ 123 ("BMO has used its role within the ACH Enterprise to conduct and participate in the collection of unlawful debts"); 140 (same for First Premiere); 157 (same for Bay Cities); 169 ("Defendants . . . receipt of money . . . was improper because the money represented

---

[7] The Court also notes that in *JLM*, the Second Circuit cited favorably an Eleventh Circuit case which applied equitable estoppel because the plaintiff's claims made reference to and arose directly out of a written agreement containing an arbitration clause. *JLM*, 387 F.3d at 178 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947-48 (11th Cir. 1999) ("Although Franklin does not allege that the service contract has been violated or breached in any way, each of her fraud and conspiracy claims depends entirely upon her contractual obligation to pay $990.00 for the service contract.")); *see also Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (quoting *MS Dealer* for the same proposition). Defendants have also cited a New York Supreme Court case applying the same principle, based on authority from the Fifth Circuit. *See Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Sup. Ct. 2005). Although, as discussed *infra* at note 8, the Court disagrees with defendants that *Hoffman* provides a separate ground for estoppel outside of the Second Circuit's intertwined-ness test, these cases combine to demonstrate that a plaintiff's reliance on a written agreement in constructing his claims makes it more likely that he will be estopped from avoiding that agreement's arbitration clause.

[8] To the extent that defendants have argued that *Hoffman*—a single New York Supreme Court case—supports the existence of a separate ground for estoppel outside of the intertwined-ness test, the Court disagrees. In addition to the proposition discussed *supra* at note 7, *Hoffman* suggests that "equitable estoppel applies . . . when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." 789 N.Y.S.2d at 415 (internal quotation marks and citation omitted). Defendants have not identified a higher court in New York which has applied estoppel on the "misconduct" ground alone, and the Second Circuit has raised concerns about the application of estoppel in the context of conspiracy allegations. *Ross*, 547 F.3d at 148; *see also Butto v. Collecto Inc.*, 845 F. Supp. 2d 491, 498 (E.D.N.Y. 2012) (noting that recent cases "cast doubt on whether concerted misconduct may even be a sufficient basis for estoppel"). In doing so, the Second Circuit emphasized that the focus of estoppel must remain on general principles of contract law, and whether "the totality of the evidence supports an objective intention to agree to arbitrate." *Id.* (quoting *Sarhank Grp. v. Oracle Corp.*, 404 F.3d 657, 662 (2d Cir. 2005)). Thus, the decision to compel arbitration here is based on the evidence of plaintiffs' consent to arbitrate with defendants, and not merely on plaintiffs' allegations of interdependent and concerted misconduct.

repayment of debts that were illegal and unenforceable"); 177 (alleging that defendants "aided and abetted the . . . Lenders' violations of New York civil usury law"); 185 ("BMO, First Premier and Bay Cities used their roles as ODFIs to originate debt entries . . . that were in violation of state law."); 196 ("Defendants' deceptive business practices include . . . repeatedly conspiring . . . to charge illegal, usurious, unconscionable fees for payday loans.").) Thus, like in *A2P*, "plaintiffs' factual allegations, alone, indicate that the claims premised upon these same facts 'arise from the subject matter' of the . . . Agreement." 972 F. Supp. 2d at 477.

Plaintiffs argue that they could still pursue their claims against defendants even if the loan agreements were invalidated, but that is not a definitive test under this prong. In the case relied on by plaintiffs for that argument, *Denney v. Jenkins & Gilchrist*, the plaintiffs did not allege that the underlying agreements were integral to the fraudulent scheme. 412 F. Supp. 2d 293, 300 (S.D.N.Y. 2005). Here, in contrast, plaintiffs allege that the illegality of the underlying agreements, and defendants' knowledge of it, is what makes defendants liable for conspiracy. Therefore, even though the invalidation of the agreements would aid, rather than defeat, plaintiffs' claims, this prong poses a different question: whether the claims arise from the same *subject matter* of the agreements, even if they are illegal.

The Court concludes that plaintiffs' claims do arise from the same subject matter as the loan agreements, in no small part because the putative class "is premised upon the relationships entered into through the . . . Agreement and is a status only conferred to those who have assented to the terms of that agreement." *A2P*, 972 F. Supp. 2d at 477.

In addition, like in *Ross*, the goal of the alleged conspiracy is directly related to the agreements: otherwise, defendants would have had no loans to facilitate. *Cf. Ross*, 547 F.3d at 146 ("It is indisputable that the subject matter of the dispute between the parties-the alleged conspiracy between Amex and the Issuing Banks to violate the antitrust laws-is related to the subject matter of the cardholder agreements the plaintiffs signed with the Issuing Banks. After all, the goal of the alleged conspiracy was to fix fees on transactions with foreign enterprises which the plaintiffs conducted by means of the credit cards they received as a result of signing the cardholder agreements."). This is not to suggest that simple but-for causation is all that is required. However, but-for causation is indicative of common subject matter. *See Birmingham Assocs. Ltd. v. Abbott Labs.*, 547 F. Supp. 2d 295, 301 (S.D.N.Y. 2008) ("The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel.") (emphasis in original and internal quotation marks omitted). Here, the first prong is satisfied because the Amended Complaint reveals far more than a but-for relationship between the loans and plaintiffs' claims: the entire case depends on the contents of the loan agreements, and in particular whether their terms are unlawful.

(2) Close relationship

The primary dispute between the parties concerns the "[t]he second prong of the equitable estoppel test[:] . . .whether there exists a sufficiently 'close relationship' between the signatory and the non-signatory who seeks to compel arbitration." *A2P*, 972 F. Supp. 2d at 478. This inquiry is highly "fact-specific," *id*., and requires a showing

7

that there is "a relationship among the parties which either supports the conclusion that [the signatory] had consented to extend its agreement to the [non-signatory], or, otherwise put, made it inequitable for [the signatory] to refuse to arbitrate on the ground that it had made no agreement with [the non-signatory]." *Sokol*, 542 F.3d at 361.

Here, the language of the five loan agreements reveals that plaintiffs consented to arbitrate not only with the signatory lenders, but also with the lenders' agents and servicers. (Pl. Ex. 1 at 645 ("any of [the lenders'] agents or servicers . . . or any affiliated entities (hereinafter collectively referred to as "related third parties")."); Pl. Ex. 2 at 659 (same); Pl. Ex. 3 at 689 (same); Pl. Ex. 4 ("or the agents, [or] servicers . . . of the other"); Pl. Ex. 5 (same).)

The question is whether it was foreseeable that defendants would be included among the lenders' agents and servicers, and the Court concludes that it was foreseeable based on the language of the loan agreements. All five loan agreements include authorizations by plaintiffs for the lenders to receive payments via electronic funds transfers. In four of the five agreements, plaintiffs explicitly authorized the lender's "servicer" or "agent" to perform the ACH debit entries, and these are the same words contained in the arbitration provisions quoted above. Therefore, plaintiffs clearly consented to arbitrate with defendants in those four agreements. *Cf. A2P*, 972 F. Supp. 2d at 479 (compelling arbitration where "[t]he RS Agreement does not specifically mention WMC, but does refer to 'agents' of CTIA and anticipates that their role will be precisely the one that WMC in fact played."). Having agreed to arbitrate with undefined agents and servicers, and likewise having agreed that agents and servicers could perform the ACH transactions, it would be inequitable for plaintiffs to avoid arbitration with those same agents and servicers.

The fifth agreement did not use the terms "servicer" or "agent" in the payment authorization provision, but it did refer to the "network" and described the lender's role as "initiat[ing]" the electronic funds transfers, which suggests that the task would be completed by a third party. (Pl. Ex. 3 at 690.) Furthermore, the fifth agreement contained the type of broadest arbitration provision, in which plaintiff Moss agreed to arbitrate "all claims against . . . agents . . . or affiliated entities." (*Id.* at 694.) By agreeing to that term, plaintiffs explicitly consented to arbitrate with an indeterminate but broad class of entities doing business with the lenders. In other words, plaintiffs knowingly agreed that, in the future, they would have to arbitrate with a party who is not named in the loan documents, and having made that agreement, plaintiffs cannot now deny the foreseeability of BMO's involvement, since its function and the existence of a "network" were explicitly mentioned in the contract. (*See* Am. Compl. ¶ 93 (naming BMO as the ODFI for the fifth loan).)

The foreseeability of defendants' involvement in the loan transactions here is distinguishable from *Ross*, on which plaintiffs have relied, and which held that American Express could not compel arbitration with holders of other companies' credit cards, who alleged that American Express had conspired with the other companies to artificially inflate certain transaction fees. 547 F.3d at 146. There, "the further necessary circumstance of some relation between Amex and the plaintiffs" was "utterly lacking." *Id.* In particular, the

8

Second Circuit noted that "Amex [was] a complete stranger to the plaintiffs' cardholder agreements; it did not sign them, it is not mentioned in them, and it performs no function whatsoever relating to their operation." *Id.* at 148. Defendants here, in contrast, are implicitly described in the arbitration provisions as "servicers" or "agents," and as discussed, defendants performed a crucial function with respect to the loans, which was referred to in the authorizations for funds transfers. Thus, defendants here are invoking arbitration provisions in contracts to which they are intimately connected, unlike American Express in *Ross*, whose "only relation with respect to the cardholder agreements was as a third party allegedly attempting to subvert the integrity of the cardholder agreements." *Id.*

Plaintiffs have also argued that the Court should not enforce the arbitration provisions because they are contained in usurious loans, and that, for the same reason, defendants have unclean hands and may not avail themselves of the equitable doctrine of estoppel. However, the legality of the loan agreements is first a question for the arbitrator, and plaintiffs have not made a distinct challenge to the validity of the arbitration provisions themselves. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2009) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. . . . [U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").[9] Plaintiffs also have not made a distinct unclean-hands argument with respect to the arbitration provision, as opposed to the loans as a whole. *See A2P*, 972 F. Supp. at 482 ("[I]n contesting the application of equitable estoppel, Plaintiffs still must discuss why Defendants' hands are unclean with regard to the making of the agreement to arbitrate.") (internal quotation marks and citation omitted). Therefore, plaintiffs' arguments concerning the legality of the loans do not affect the enforceability of the arbitration provisions to which plaintiffs agreed.

In sum, the Court concludes that estoppel is appropriate here because all defendants are "linked textually" to the arbitration provisions. *Choctaw*, 271 F.3d at 407; *accord David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991) ("Federal policy requires us to construe arbitration clauses as broadly as possible." (internal quotation marks and citation omitted)). Combined with the fact that plaintiffs' claims arise out of, and depend heavily on, the existence of the loan agreements, the textual linkages between the agreements and defendants demonstrate that "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Ross*, 547 F.3d at 144 (internal quotation marks and further citation omitted). Accordingly, plaintiffs are estopped from avoiding arbitration with defendants.[10]

---

[9] Plaintiffs contend that *Cardegna* only applies between signatories to a contract, but they cite no authority for limiting its holding in that way. Given the Supreme Court's repeated emphasis on the strong federal policy in favor of arbitration, which requires that arbitration agreements be placed "upon the same footing as other contracts," *Carlisle*, 556 U.S. at 630 (citation omitted), the Court declines to limit *Cardegna*.

[10] As an alternative to estoppel, defendants also argue that they may compel arbitration as third-party beneficiaries of the loan agreements. However, "it remains an open question in this Circuit whether the

## IV. CONCLUSION

The broad arbitration provisions in the loan agreements, and the specific authorizations of electronic funds transfers, made it foreseeable that entities like defendants, who are involved in those transfers, would be among the third parties with whom plaintiffs agreed to arbitrate. Accordingly, the motions to compel arbitration are granted, and this case is stayed. *See* 9 U.S.C. § 3. The Court does not reach the motions to dismiss.

The parties are hereby ordered to proceed to arbitration, as required by the provisions in the loan agreements. This case is stayed, and the Court will not consider the motions to dismiss until the case has proceeded through arbitration.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: June 9, 2014
Central Islip, NY

\*\*\*

Plaintiffs are represented by Darren T. Kaplan, Chitwood Harley Harnes LLP, 11 Grace Avenue, Suite 306, Great Neck, NY 11021; Jeffrey Ostrow, Kopelowitz Ostrow P.A., 200 SW 1st Avenue, Fort Lauderdale, FL 33301; Hassan Zavareei and Jeffrey D. Kaliel, Tycko & Zavareei LLP, 2000 L Street NW, Suite 808, Washington, DC 20036; Norman Siegel and Stephen N. Six, Stueve Siegel Hanson LLP, 460 Nichols Road, Suite 200, Kansas City, MO 64112. Defendant BMO is represented by Therese Craparo, Debra Bogo-Ernst, Kevin Ranlett, Lucia Nale, and Matthew Sostrin, Mayer Brown LLP, 71 S Wacker Drive, Chicago, IL 60606; Defendant First Premier is represented by David Todd Feuerstein, Herrick, Feinstein LLP, 2 Park Avenue, New York, NY 10016, and John C. Elkman, Bryan Freeman, and James P. McCarthy, Lindquist & Vennum, 4200 Ids Center, 80 South 8th Street, Minneapolis, MN 55402; Defendant Bay Cities is represented by Eric Rieder, Ann W. Ferebee, Courtney Janae Peterson, and Michael P. Carey, Bryan Cave LLP, 1201 W Peachtree Street NW, 14th Floor, Atlanta, GA 30309.

---

non-signatory may proceed upon any theory other than estoppel." *Ross*, 547 F.3d at 143 n.3. Because the Court has determined that estoppel applies here, the Court need not address whether, in the alternative, defendants were third-party beneficiaries.

10