# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

Nº 13-CV-5438 (JFB) (GRB)

————————————————

## DEBORAH MOSS,
ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

VERSUS

## BMO HARRIS BANK, N.A., FIRST PREMIER BANK, AND BAY CITIES BANK,

Defendants.

————————————————

**MEMORANDUM AND ORDER**
July 7, 2017

————————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Deborah Moss ("Moss" or "plaintiff") brings this putative class action against defendant First Premier Bank[1] ("First Premier" or "defendant") alleging (1) a substantive violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act pursuant to 18 U.S.C. § 1962(c) and conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d); and (2) New York State law claims for a violation of the General Business Law (the "GBL"), N.Y. Gen. Bus. Law § 349, and for unjust enrichment.[2]  Defendant now moves to dismiss plaintiff's Second Amended

Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons set forth below, the Court dismisses plaintiff's substantive RICO claim because plaintiff has not adequately alleged (1) the existence of an association-in-fact enterprise; and (2) that defendant conducted or participated in the affairs of a RICO enterprise.  As a result, the RICO conspiracy claim must also be dismissed because there is no plausible underlying substantive violation.

With respect to plaintiff's state law claims, the Court agrees with defendant that plaintiff has failed to state a cause of action under the GBL because there are no allegations that defendant engaged in

---

[1]  Plaintiff's initial complaint and first amended complaint also asserted claims against BMO Harris Bank, N.A. and Bay Cities Bank, and the latter party joined the instant motion.  (*See* ECF Nos. 1, 38.)  However, plaintiff stipulated to dismissal of those parties from this action on January 7, 2016 and March 27, 2017, respectively.  (*See* ECF Nos. 111, 133.)

[2]  At oral argument on the instant motion, plaintiff conceded that the applicable statute of limitations barred her New York State law claim for aiding and abetting violations of the Civil Usury Law, N.Y. Gen. Oblig. Law § 5-501, and she voluntarily withdrew that cause of action.  Accordingly, the Court dismisses that claim with prejudice.

consumer-oriented, misleading conduct. However, defendant's motion is denied with respect to the unjust enrichment claim because the Court concludes that plaintiff has adequately alleged that she conferred a benefit on defendant.

Finally, in an abundance of caution, the Court will permit plaintiff to amend her pleading one final time to attempt to allege plausible RICO and GBL claims.

## I. BACKGROUND

### A. Factual Background

The Court takes the following facts from the SAC. (ECF No. 123.) The Court assumes these facts to be true for purposes of deciding this motion and construes them in the light most favorable to plaintiff as the non-moving party.

#### 1. The Parties

Plaintiff Deborah Moss is a citizen and resident of New York and resides in the hamlet of Bay Shore, Town of Islip, County of Suffolk. (SAC ¶ 13.) Defendant First Premier is a South Dakota state-chartered bank with main offices in Sioux Falls, South Dakota. (*Id*. ¶ 14.)

#### 2. Nature of the Action

This case arises out of online payday loans, which are "short-term (typically a matter of weeks) high fee, closed-end loan[s], traditionally made to consumers to provide funds in anticipation of an upcoming paycheck." (*Id*. ¶ 26.) They "feature exorbitant interest rates (sometimes misleadingly referred to as 'fees') and require 'balloon' repayments shortly after the loan is made." (*Id*. ¶ 29.) Several states, including New York, have banned payday loans. (*Id*. ¶¶ 2, 4, 32.) However, certain payday lenders "make use of the Internet to circumvent these

prohibitions and offer payday loans to consumers residing in these states" through the Automated Clearing House ("ACH") Network, a payment "processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing." (*Id*. ¶¶ 5, 34.)

#### 3. The ACH Network

ACH transactions are the debits and credits necessary for an exchange between a payday creditor and lender, and they are performed by entities known as Originating Depository Financial Institutions ("ODFIs"), which are banks belonging to the ACH Network that transmit the funds from one party to the other party's bank, which is the Receiving Depository Financial Institution ("RDFI"). (*Id*. ¶¶ 8, 26-27, 40.) Plaintiff alleges that ODFIs allow payday lenders to access the ACH Network and electronically debit a borrower's deposit account for the loan payment amounts and associated fees. (*Id*. ¶ 27.) Without the participation of OFDIs to "initiate" debit entries and "originate" those entries into the ACH Network, a payday lender cannot reach a borrower's account. (*Id*.)

The National Automated Clearing House Association ("NACHA"), which is the organization that provides governing rules for the ACH Network, refers to ODFIs as "the gatekeepers of the ACH Network." (*Id*. ¶ 45.) The NACHA Operating Rules govern ACH Network participants and provide a legal framework for the ACH Network. (*Id*. ¶ 37.) They require ODFIs to perform due diligence so as to ensure that entities, like payday lenders, that seek to introduce a debit into the ACH Network (known as "Originators") comply with federal and state law. (*Id*. ¶¶ 39, 42-43.) In addition, the NACHA Operating Rules require ODFIs to enter into agreements with Originators, and when an ODFI transmits a debit over the

ACH Network, it must warrant that the entry has been properly authorized by the Originator. (*Id.* ¶¶ 7, 49.)

Plaintiff also alleges that NACHA and other financial regulatory bodies have specifically warned ODFIs about the risk of processing ACH transactions related to payday loans. (*See generally id.* ¶¶ 57-77.) In addition, NACHA has identified two high-risk entry codes—ACH WEB and ACH TEL—for entries into the ACH Network that are often used by payday lenders. (*Id.* ¶ 57.) When requesting a WEB entry, NACHA requires that an ODFI certify that it has implemented fraud detection systems, verified the identity of the receiver, and verified the routing number. (*Id.* ¶¶ 58-60.)

4. Plaintiff's Payday Loans

Plaintiff applied for and received two payday loans: one for $350 on June 17, 2010; and one for $400 on October 15, 2010. (*Id.* ¶¶ 92-96.) SFS, Inc. ("SFS"), a Nebraska-based entity, was the lender for these transactions. (*Id.* ¶¶ 16, 92-96.) Defendant was the ODFI for the June 2010 loan. (*Id.* ¶ 94.) Plaintiff asserts that defendant received a benefit from processing this loan in the form of an origination fee paid from plaintiff's account. (*Id.* ¶ 97.)

5. Defendant's Business

Plaintiff alleges that defendant "was one of only thirty 'Direct Financial Institution Members of NACHA' [that] influences the governance and direction of the ACH Network and the NACHA Operating Rules . . . ." (*Id.* ¶ 36.) As a result, defendant "is eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies." (*Id.*)

In addition, plaintiff asserts that defendant knew that it processed unlawful ACH transactions on behalf of payday lenders, including SFS. (*Id.* ¶¶ 78, 81, 84-87.) Plaintiff contends that defendant did so and ignored certain warning signs, such as high return rates for those transactions, in return for fees paid by the payday lenders, and she claims that defendant was able to charge the lenders higher fees than for other ACH transactions because of the risks inherent in online payday lending. (*Id.* ¶¶ 81-82, 85-87, 89.) Further, according to plaintiff, 99% of financial institutions on the ACH Network have never originated entries at the request of unlicensed, online payday lenders; in contrast, however, defendant was purportedly one of the most active originators of ACH WEB and ACH TEL entries on the ACH Network. (*Id.* ¶¶ 80-81.)

B. Procedural Background

Plaintiff commenced this action on November 30, 2013 and filed an amended complaint on January 3, 2014. (ECF Nos. 1, 38.) On June 9, 2014, the Court granted defendant's motion to compel arbitration and stayed this action. *See Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 284 (E.D.N.Y. 2014). Thereafter, on July 16, 2015, the Court vacated its arbitration order and lifted the stay after plaintiff informed the Court that the designated forum had declined to arbitrate the case. *See Moss v. BMO Harris Bank, N.A.*, 114 F. Supp. 3d 61, 63 (E.D.N.Y. 2015). Following an interlocutory appeal, the Second Circuit affirmed that decision. *See Moss v. First Premier Bank*, 835 F.3d 260 (2d Cir. 2016).

Plaintiff then filed the SAC on October 4, 2016. (ECF No. 123.) Defendant moved to dismiss on November 17, 2016 (ECF No. 125); plaintiff filed her opposition on January 4, 2017 (ECF No. 127); and defendant replied on January 24, 2017 (ECF No. 130). The

Court heard oral argument on February 13, 2017, and defendant subsequently filed letters providing additional, unpublished legal authority in support of its motion on March 7, 2017 and June 7, 2017 (ECF Nos. 131, 134). The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Supreme Court instructed district courts to first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556-57 (internal citation omitted)).

The Court notes that in adjudicating a Rule 12(b)(6) motion, it is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and reversed in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935 (2005); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court . . . could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of

heir contents and they were integral to plaintiffs' claim.").

## III. DISCUSSION

Defendant moves to dismiss plaintiff's substantive RICO claim for failure to state a plausible cause of action because plaintiff has not adequately pled (1) the existence of an association-in-fact enterprise; and (2) that defendant conduct or participated in the affairs of a RICO enterprise. In addition, defendant argues that the RICO conspiracy claim must be dismissed because plaintiff has not plausibly alleged an underlying substantive violation. For the reasons set forth below, the Court agrees with all of these arguments and dismisses plaintiff's RICO claims.[3]

In addition, the Court agrees with defendant that plaintiff has not adequately pled a cause of action under the GBL because there are no allegations that defendant engaged in consumer-oriented, misleading conduct. However, the Court concludes that plaintiff has sufficiently alleged her unjust enrichment claim because the SAC states that defendant received a benefit from plaintiff in return for processing a payday loan.

Finally, in an abundance of caution, the Court will permit plaintiff to file an amended complaint to attempt to allege plausible RICO and GBL claims.

### A. RICO

#### 1. Applicable Law

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "When § 1962 is violated, in addition to criminal penalties, the RICO statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and attorney's fees." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

To establish a civil RICO claim for unlawful debt collection, a plaintiff must allege, *inter alia*, (1) the existence of a RICO enterprise; and (2) that the defendant conducted the affairs of the enterprise, *Durante Bros. & Sons v. Flushing Nat. Bank*, 755 F.2d 239, 248 (2d Cir. 1985), as well as "injury to business or property as a result of the RICO violation," *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). A RICO claim thus

---

[3] Accordingly, the Court need not, and does not, address defendant's additional arguments that dismissal is warranted because (1) plaintiff has not sufficiently pled that defendant knew of the unlawful debt collection; (2) plaintiff has not sufficiently pled that defendant was in the business of making usurious loans or collected an unlawful debt; and (3) even assuming that plaintiff has pled a plausible RICO claim, she has not alleged a cognizable injury. *See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("Because we agree

with the District Court that [RICO] Counts Five and Six were insufficiently pled, we need not—and do not—reach the merits of the District Court's decisions regarding either ripeness, standing, or personal jurisdiction."); *Boritzer v. Calloway*, No. 10 CIV. 6264 JPO, 2013 WL 311013, at *13 (S.D.N.Y. Jan. 24, 2013) ("Here, as Plaintiffs have not adequately pleaded a RICO violation, the first element is not met. Accordingly, Plaintiffs lack standing due to their failure to plead a RICO violation. The Court does not reach the issues of injury or causation.").

contains three principal elements: "(1) a violation of 18 U.S.C. § 1962; (2) injury to plaintiff's business or property; and (3) causation of the injury by the violation." *Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207, 222 (E.D.N.Y. 2014).

Courts have described civil RICO as "'an unusually potent weapon—the litigation equivalent of a thermonuclear device.'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)), *aff'd*, 113 F.3d 1229 (2d Cir. 1997). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Id.* (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)); *see also DLJ Mortg. Capital*, 726 F. Supp. 2d at 236. Indeed, although civil RICO may be a "potent weapon," plaintiffs wielding RICO almost always miss the mark. *See Gross v. Waywell*, 628 F. Supp. 2d 475, 479-83 (S.D.N.Y. 2009) (conducting survey of 145 civil RICO cases filed in the Southern District of New York from 2004 through 2007, and finding that all thirty-six cases resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage). Accordingly, courts have expressed skepticism toward civil RICO claims. *See, e.g.*, *DLJ Mortg. Capital*, 726 F. Supp. 2d at 236 ("[P]laintiffs have often been overzealous in pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as RICO violations.").

Although civil RICO presents many hurdles for a plaintiff to overcome, the Supreme Court has also "made clear that it would not interpret civil RICO narrowly." *Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 139 n.6 (2d Cir. 2001) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)). In *Sedima*, the Supreme Court rejected an interpretation of civil RICO that would have confined its application to "mobsters and organized criminals." 473 U.S. at 499. Instead, the Court held: "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Id.* (internal citation and quotation marks omitted); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 479 (2006) (Breyer, J., concurring in part and dissenting in part) ("RICO essentially seeks to prevent organized criminals from taking over or operating legitimate businesses. Its language, however, extends its scope well beyond those central purposes."). Thus, a court should not dismiss a civil RICO claim if the complaint adequately alleges all elements of such a claim, even if the alleged conduct is not a quintessential RICO activity.

2. Analysis

Here, plaintiff has attempted to plead a substantive RICO claim based on the collection of unlawful debt. (*See* SAC ¶¶ 105-33.) However, the SAC fails to state a plausible cause of action because it does not adequately allege (1) the existence of a RICO enterprise; and (2) that defendant conducted or participated in an enterprise's affairs. The RICO conspiracy claim is, thus, also deficient because the SAC does not plead an underlying substantive violation of RICO.

a. Enterprise

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Although RICO "does not

specifically define the outer boundaries of the 'enterprise' concept," *Boyle v. United States*, 556 U.S. 938, 944 (2009), it is clear that "any legal entity may qualify as a RICO enterprise," *First Capital Asset Mgmt.*, 385 F.3d at 173.

"[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 946 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). In *Boyle*, the Supreme Court held that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* Where a complaint alleges an association-in-fact enterprise, courts in this Circuit look to the "hierarchy, organization, and activities" of the association to determine whether "its members functioned as a unit." *First Capital Asset Mgmt.*, 385 F.3d at 174 (internal citations omitted).

The Second Circuit has made clear that "the person and the enterprise referred to must be distinct," and, therefore, "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994). However, "[t]his does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is *sufficiently distinct from itself.*" *Id.* (emphasis added). Thus, "a defendant may be a RICO person and one of a number of members of the RICO enterprise." *Id.*

Here, plaintiff propounds two alternative theories as to the existence of an association-in-fact enterprise that the Court will refer to as the "ACH Network Enterprise" and the "Debt Collection Enterprise." Count 1 of the SAC posits that the ACH Network constitutes an enterprise consisting of (1) "Originators" that "initiate entries into the ACH Network"; (2) "ODFIs" that include "all financial institutions participating in the ACH Network that originate ACH entries"; (3) "RDFIs" that include "all depository financial institutions participating in the ACH Network that receive ACH transaction instructions"; (4) "ACH Operators" that include "two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network"; and (5) "Third Party Service Providers" that include other entities that "perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries." (SAC ¶ 107.)

Plaintiff alleges that the components of the "ACH Network Enterprise share the common lawful and legitimate purpose of facilitating batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions." (*Id.* ¶ 108.) In addition, plaintiff contends that the ACH Network Enterprise's participants "preserve close business relationships and maintain established and defined roles within the enterprise," and that the enterprise "has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose." (*Id.*)

In Count 2 of the SAC, plaintiff asserts, in the alternative, that First Premier and SFS "associated together to use their respective roles in the ACH Network for the common purpose of profiting through the collection of unlawful debt." (*Id.* ¶ 122.) As with the ACH Network Enterprise, plaintiff alleges that the Debt Collection Enterprise exhibits a mutual goal, a defined relationship between

its members, and sufficient longevity. (*Id.* ¶ 128.)

### i. ACH Network Enterprise

Defendant argues (and the Court agrees) that plaintiff's first theory is too amorphous to meet the *Boyle* standard. In essence, plaintiff seeks to implicate an entire industry—from the Federal Reserve to local banks that participate in the ACH Network—in the efforts by SFS and other payday lenders to collect unlawful debt.

However, to satisfy the first prong of the *Boyle* test, the participants in an association-in-fact enterprise "'must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes.'" *New York v. United Parcel Serv., Inc.*, No. 15-CV-1136 (KBF), 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (emphasis added) (quoting *First Capital Mgmt.*, 385 F.3d at 174). Accordingly, failing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (affirming dismissal of association-in-fact RICO claim where the amended complaint admitted that certain participants in purported enterprise were not aware of deceptive practices at issue); *First Nationwide Bank v. Gelt Funding, Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993), *aff'd*, 27 F.3d 763 (2d Cir. 1994).

In the SAC, plaintiff affirmatively states that the myriad institutions that utilize the ACH Network "share the common *lawful and legitimate purpose* of facilitating batch processing of electronic payments . . . ." (SAC ¶ 108 (emphasis added).) Further, there are no allegations that the Originators, ODFIs, RDFIs, ACH Operators, and Third Party Service Providers comprising the ACH Network joined together with the goal of collecting unlawful debt. Moreover, plaintiff claims that NACHA represents more than 10,000 entities (SAC ¶ 80), and it is implausible based upon the allegations that each of those institutions possesses the unlawful intent required to transform that cooperative into an association-in-fact enterprise for RICO purposes.

Nevertheless, plaintiff argues that

> when the alleged enterprise is a "legitimate" one—like the ACH Network Enterprise alleged here—it makes little difference whether [the] enterprise is expansive or whether participants come and go. Instead, the relevant inquiry is simply whether the defendant used its role within the enterprise to facilitate unlawful activity. . . . Thus, as long as the enterprise meets the "low threshold" of *Boyle*, the Court need not concern itself with whether every good actor in the enterprise can be identified.

(Pl.'s Opp'n Br., ECF No. 127, at 8.) However, plaintiff's effort to inject a dichotomy into the case law by delineating one pleading standard for "legitimate" enterprises and another for "illegitimate" enterprises has no legal support. In *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127 (S.D.N.Y. 2014), *aff'd in part, rev'd in part on other grounds sub nom. Babb v. Capitalsource, Inc.*, 588 F. App'x 66 (2d Cir. 2015), the district court dismissed RICO claims alleging that the defendants used the Mortgage Electronic Registration System ("MERS") to conceal unlawful mortgage transfers. The court found that the complaint "contain[ed] insufficient factual allegations to plausibly support the existence of a RICO association-in-fact enterprise among the Defendants collectively" because, irrespective of their

membership in and use of MERS, there were no allegations of

> coordinated activity to jointly achieve a *common fraudulent purpose*. The allegation that each of the Defendants uses the MERS system to further its own business goals is insufficient to plausibly support the existence of a RICO enterprise; inside traders all use the stock market to further their unlawful goals, but that alone does not plausibly lead to the conclusion that they are all working together as part of a single enterprise in furtherance of a *larger fraudulent scheme.*

*Id*. at 141-42 (emphasis added).

Likewise, in the instant case, the SAC states that "[w]hile First Premier shares in the common purpose of the ACH Network and uses the ACH Network to originate lawful and legitimate transactions, First Premier also uses its role within the ACH Network Enterprise to conduct and participate in the collection of unlawful debts . . . ." (*Id*. ¶ 113.) This claim thus parallels the enterprise theory that the court correctly found wanting in *Anctil* because plaintiff asserts that defendant used an otherwise legitimate network to advance its own, illegitimate business interests. However, defendant's alleged illicit ACH transactions do not render the entire ACH Network a RICO enterprise absent a common purpose among the other network participants to violate RICO. *See Jubelirer v. MasterCard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) (dismissing RICO claim predicated on alleged association between credit card issuers and Internet casino because "[a]ccepting plaintiff's allegations as sufficient to allege a RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant,

MasterCard and lender is a RICO enterprise"). As the *Anctil* court adroitly observed, such a holding would extend RICO liability to a vast marketplace based on one bad actor's mere association with the other members of that collective.

Further, in addition to alleging a common fraudulent purpose, a plaintiff must "provide [the Court] with . . . solid information regarding the hierarchy, organization, and activities of [an] alleged association-in-fact enterprise." *First Capital Asset Mgmt.*, 385 F.3d at 174. The SAC fails on this account, as well, because besides describing the roles played by the various ACH Network participants, plaintiff has not set forth any allegations, outside of conclusory statements, to support a plausible claim that those entities formed an "'ongoing organization, formal or informal,'" or any allegations tending to show that "'the various associates [of the alleged enterprise] function as a continuing unit.'" *Id*. at 173 (quoting *Turkette*, 452 U.S. at 583). Although a RICO enterprise need not have a formal hierarchy, *see Boyle*, 556 U.S. at 948, plaintiff only alleges that "participants in the ACH Network Enterprise preserve close business relationships and maintain established and defined roles within the enterprise" (SAC ¶ 108). This allegation is insufficient to state a RICO claim.

In a recent decision, Judge Azrak correctly dismissed a RICO complaint based on an alleged association-in-fact enterprise of hundreds of pharmacies, distributors, importers, and online sellers because the plaintiff's "allegations fail[ed] to support an inference that the defendants []—distributors from dozens of states as well as overseas and small, independent pharmacies similarly widespread—had a relationship amounting to a RICO enterprise." *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2017 WL 57802, at *4 (E.D.N.Y. Jan. 4, 2017). "Without factual allegations showing

these 300 defendants had an interpersonal relationship in which they worked together for a common illicit interest, [the plaintiff's] pleadings constitute[d] nothing more than the 'conclusory naming of a string of entities' combined with legal conclusions." *Id.*

Similarly, here there are "no alleged facts [that] support an inference that the [ACH Network] entities were acting in any way but in their own independent interests." *Id.* Plaintiff has not described with any specificity the personal relationships among the various Originators, ODFIs, RDFIs, ACH Operators, and Third Party Service Providers in the ACH Network, let alone how those entities coordinate their activities so as to advance a collective goal outside of their own discrete pecuniary objectives.[4] "[W]ithout factual allegations that [these entities] cooperated to form a continuing unit working toward a common purpose, their mere independent, uncoordinated participation in this market does not create a RICO enterprise." *Id.*; *see also Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11-CV-7801 (PAE), 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012) (dismissing RICO claim for failure to "make any concrete factual assertions as to the mechanics of the interactions among defendants, including facts indicating that the disparate defendants functioned as a unit, or supporting the inference that defendants had a common interest in the success of the so-called enterprise").

Moreover, plaintiff's inclusion of non-defendants in the alleged ACH Network Enterprise is emblematic of a "hub and spokes" enterprise structure that other courts have consistently and correctly rejected. In essence, plaintiff asserts that defendant contracted with payday lenders to process usurious loan transactions, and those allegations are insufficient to support a conclusion that the *ACH Network entities* associated with one another for a common purpose. *See Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449-50 (S.D.N.Y. 2007) (stating that a "'hub-and-spokes' structure—that is, allegations that a common defendant perpetrated various independent frauds, each with the aid of a different co-defendant—do not satisfy the enterprise element of a RICO claim"); *see also, e.g., Abbott Labs.*, 2017 WL 57802, at *5 ("The parallel conduct of a number of 'spokes,' even through a central 'hub,' is not a RICO enterprise without more—that is, without a 'rim' that connects the spokes."); *N.Y. Automobile Insurance Plan v. All Purpose Agency and Brokerage, Inc.*, No. 97 Civ. 3164 (KTD), 1998 WL 695869, at *6 (S.D.N.Y. Oct. 6, 1998) (denying plaintiff's motion for summary judgment and holding that a series of discontinuous independent frauds does not constitute an enterprise, but rather a series of two-party conspiracies).

The Third Circuit rejected an association-in-fact enterprise similar to the ACH Network in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010). There, the plaintiff alleged "massive conspiracies throughout the insurance industry" carried out by the defendant insurers and insurance brokers through anti-competitive practices. *Id.* at 308. However, the court held that, "[e]ven under the relatively undemanding standard of *Boyle*,"

---

[4] Insofar as the SAC alleges that the NYCHA Operating Rules create cohesion within the ACH Network sufficient to meet the *Boyle* standard, "defendant's membership in a trade association hardly renders plausible the conclusion that entity and certain other members are functioning as an ongoing, organized, structured enterprise in conducting their business." *Anctil*, 998 F. Supp. 2d at 142 (citing *Purchase Real Estate Grp. v. Jones*, No. 05-CV-10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010)).

the "plaintiff had failed to plead facts plausibly suggesting collaboration among the insurers" and "therefore [could not] provide a 'rim' enclosing the 'spokes' of the[] alleged 'hub-and-spoke' enterprises." *Id.* at 374 (citing, *inter alia*, *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 307 (S.D.N.Y. 2010) (holding that a RICO claim pleading "nothing more than parallel conduct by separate actors" is insufficient: "there has to be something that ties together the various defendants allegedly comprising the association in fact into a single entity that was formed for the purpose of working together—acting in concert—by means of" racketeering acts)). Otherwise, "competitors who independently engaged in similar types of transactions with the same firm could be considered associates in a common enterprise. Such a result would contravene *Boyle*'s definition of 'enterprise.'" *Id.* at 375. So, too, has plaintiff in the instant case pled a "hub and spokes" enterprise without a unifying rim because she alleges that defendant separately agreed with payday lenders like SFS to collect unlawful debt, but does not explain how the other members of the ACH Network collaborated with defendant to advance that goal.

The deficiencies discussed above led the U.S. District Court for the Northern District of Georgia to reject substantially similar claims in two separate cases brought by counsel for plaintiff in this action. In *Parm v. Nat'l Bank of California, N.A.* ("*Parm I*"), No. 4:14-CV-0320-HLM, 2015 WL 11605748 (N.D. Ga. May 20, 2015), *aff'd*, 835 F.3d 1331 (11th Cir. 2016), the court

found that the "mere size of the ACH Network Enterprise alone may be insufficient to preclude the existence of a RICO enterprise, but its expansive size combined with its amorphous and constantly changing members along with the minimal connection between the various merchants allegedly involved in the enterprise" a RICO claim.[5] *Id.* at *23. Further, in *Flagg v. First Premier Bank*, No. 1:15-CV-00324-MHC (N.D. Ga. June 7, 2017) (unpublished decision), the court held that the "the alleged ACH Network enterprise [was] rendered equally defective by its sheer scope and imprecision." Slip op. at 14. Of the "nearly innumerable participants in the ACH Network, who together constitute much of the nation's banking industry, only [First Premier] [was] accused of wrongdoing; in other words, Plaintiff's allegations, while creative, essentially attempt[ed] to recast a contractual relationship as a RICO enterprise.'" *Id.* at 14-15. The Court agrees with both of these decisions.[6]

Finally, plaintiff's efforts to distinguish this case law are unavailing. As previously noted, there is no legal support for her argument that this Court should ignore *In re Insurance Brokerage Antitrust Litigation* and *First Nationwide Bank* because those cases concerned "*illegitimate* enterprise[s]," whereas "the ACH Network Enterprise is pleaded as a 'legitimate' enterprise which Defendant[] use[s] as a 'vehicle through which unlawful . . . activity is committed.'" (Pl.'s Opp'n Br. at 9 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 164 (2001).) Plaintiff has not provided any

---

[5] As discussed *infra*, the *Parm* court granted the plaintiff leave to submit an amended pleading that included an enterprise theory identical to the Debt Collection Enterprise at issue here, and it subsequently dismissed that claim, as well.

[6] In contrast, the Court does not find *Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605 (M.D.N.C. 2014), to be persuasive. In that action, which was also brought by plaintiff's counsel, the district court summarily denied the defendants' motions to dismiss after reciting the elements necessary to state a RICO claim and finding—without explanation or analysis—that the plaintiff had "adequately alleged each of these elements as to each defendant." *Id.* at 618.

authority that supports this disjunction, and on the contrary, *Anctil* and *Jubleliter* correctly make clear that the same pleading standards apply irrespective of whether the alleged association-in-fact is inherently legitimate or illegitimate.[7]

In sum, plaintiff's ACH Network Enterprise fails because she has not alleged that the participants in that association shared a common fraudulent purpose and has not alleged that association functioned as a continuing unit with a clear organizational structure. At best, the SAC asserts a rimless "hub and spokes" relationship between defendant and payday lenders like SFS that courts have consistently found insufficient to state a RICO claim.

### ii. Debt Collection Enterprise

As an alternative to her ACH Network Enterprise theory, plaintiff alleges that defendant and SFS together formed an association-in-fact by virtue of their relationship with each other and their participation in the ACH Network as an ODFI and an Originator, respectively. The SAC states that "First Premier and SFS associated together to use their respective roles in the ACH Network for the common purpose of profiting through the collection of unlawful debt." (SAC ¶ 122.) Further, "First Premier charged SFS a fee for every ACH debit entry First Premier originated on behalf of SFS." (*Id.* ¶ 125.)

This enterprise also fails to support a plausible RICO claim. *See Anctil*, 998 F. Supp. 2d at 142 n.11 ("To the extent some of the RICO claims allege smaller associations-in-fact among certain Defendants and other nonparty entities, those claims fail for lack of

distinctness between the 'enterprise' and 'pattern of racketeering activity' elements." (citing *Turkette*, 452 U.S. at 583)). Beyond describing the roles defendant and SFS played within the ACH Network, the SAC "gives no basis for inferring that these two [entities] in isolation formed 'an ongoing organization, formal or informal,' let alone a coherent 'entity separate and apart' from the alleged fraudulent scheme." *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (quoting *Turkette*, 452 U.S. at 583). In *D. Penguin Bros.*, the Second Circuit, after finding that the plaintiff had failed to allege a "plausible common purpose" uniting a group of defendants, rejected the plaintiffs' alternative association-in-fact theory premised on the relationship between two of those defendants. *Id.* The Court held that the plaintiffs had "fail[ed] to provide a plausible basis for inferring that [the two defendants] acted 'on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities, to advance their individual self-interests.'" *Id.* (third alteration and emphasis in original) (quoting *United Food & Comm. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013)). Although the plaintiffs may have adequately pled the defendants had "worked together in some respects to steal [the] plaintiffs' funds," there were no plausible allegations that "that they did so to advance the [] agenda of their purported 'enterprise' or for any shared purpose. As the Seventh Circuit has observed, 'RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the

---

[7] In addition, plaintiff's attempt to characterize *Anctil* as a decision involving an "illegitimate association-in-fact enterprise" (Pl.'s Opp'n Br. at 10) is at odds with the facts of that case because there, as here, the

defendants used an otherwise lawful industry network to further their own illicit ends. *Anctil*, 998 F. Supp. 2d at 142.

statute.'" *Id.* (quoting *Walgreen Co.*, 719 F.3d at 851).

Similarly, beyond asserting here that defendant processed a single payday loan on behalf of SFS (SAC ¶¶ 92-94); that defendant received a fee for that service (*id.* ¶ 125); and that defendant and SFS "share the common unlawful purpose of using their respective roles in the ACH Network to profit through the collection of unlawful debt" and "preserve a close business relationship and maintain established and defined roles within enterprise" (*id.* ¶ 128), there are no allegations in the SAC that these entities "acted on behalf of the *enterprise* as opposed to on behalf of [themselves] in their individual capacities," or "any basis for inferring that [they] in isolation formed an ongoing organization, formal or informal, let alone a coherent entity separate and apart from the alleged fraudulent scheme."[8] *D. Penguin Bros.*, 587 F. App'x at 668. At best, plaintiff has alleged a single fraudulent transaction carried out by defendant and SFS, and the SAC thus "lacks well-pleaded factual allegations that [they] worked together as part of a cohesive criminal enterprise." *Singh v. NYCTL 2009-A Trust*, No. 14 CIV. 2558, 2016 WL 3962009, at *10 (S.D.N.Y. July 20, 2016), *aff'd*, --- F. App'x ---, No. 16-2814-CV, 2017 WL 1087936 (2d Cir. Mar. 21, 2017).

Moreover, beyond describing how ODFIs process ACH transactions on behalf of Originators like SFS, the SAC "fail[s] to make any concrete factual assertions as to the mechanics of the interactions among defendants." *Id.* (quoting *Cont'l Petroleum Corp.*, 2012 WL 1231775, at *6). There are no allegations of any communications

between defendant and SFS, and insofar as plaintiff states that there was a contract between the two entities for the purpose of processing ACH Transactions (*see* SAC ¶¶ 112, 120), such an agreement does not plead a RICO enterprise. *See id.* (holding that a RICO "enterprise must be more than a routine contractual combination for the provision of financial services") (quoting *Jubelirer*, 68 F. Supp. 2d at 1053) (citing *Bonadio v. PHH Mortg. Corp.*, No. 12 CV 3421(VB), 2014 WL 522784, at *3 (S.D.N.Y. Jan. 31, 2014) (dismissing RICO claim when plaintiff's "only factual allegations relating to the enterprise are that its members had ongoing business relationships"); *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1092 (N.D. Cal. 2006) (rejecting a RICO enterprise based upon "the existence of routine contractual relationships")); *see also Chi v. MasterCard Int'l, Inc.*, No. 1:14-CV-614 (TWT), 2014 WL 5019917, at *2 (N.D. Ga. Oct. 7, 2014) ("Courts have specifically held that where credit card companies are carrying out their business of processing transactions, they are not participating in a RICO enterprise.").

For these reasons, the *Parm* and *Flagg* courts also rejected the Debt Collection Enterprise theory. In *Parm v. Nat'l Bank of California, N.A.* ("*Parm II*"), No. 4:14-CV-0320-HLM (N.D. Ga. Mar. 6, 2017) (unpublished decision), the district court dismissed an amended complaint filed by the plaintiff that alleged a two-party association-in-fact enterprise comprising a payday lender and an ODFI because those allegations evinced, "at most, a routine contractual combination to provide financial services. That type of enterprise is not generally sufficient to constitute a RICO enterprise

---

[8] Plaintiff's argument that defendant misconstrues the Second Circuit's citation to *Turkette* in *D. Penguin Brothers* because *Turkette* "requires only the presence of the structural features necessary to form an enterprise separate and distinct from just the 'pattern

of racketeering activity'" (Pl.'s Opp'n Br. at 18 (quoting *Turkette*, 452 U.S. at 583)) is irrelevant. On its own terms, *D. Penguin Brothers* holds that simply alleging that two entities together violated RICO does not, without more, plead a RICO enterprise.

under § 1962(c)." Slip op. at 91. Likewise, *Flagg* held that "while the Complaint allege[d] that [First Premier] and [the payday lender] 'associated together,' had a 'close business relationship,' and that [First Premier] played a 'distinct role' in the 'operation, management, and control' of their shared enterprise, it [made] no specific allegations concerning any association, communication, or collaboration between the two that would suggest they in fact had a 'business relationship.'" Slip op. at 21. The Court again agrees with both decisions.

Finally, plaintiff's reliance on *Reyes v. Zion First Nat. Bank*, No. CIV.A. 10-345, 2012 WL 947139 (E.D. Pa. Mar. 21, 2012), is misplaced. There, the district court found that the plaintiff adequately pled a RICO enterprise based on allegations that a bank and a payment processor "each serve[d] independent and crucial roles in conducting an enterprise with the common purpose of earning fees for facilitating fraudulent telemarketing schemes." *Id.* at \*6. Crucially, however, there were allegations in that case that those entities "discussed the high return rates" they received from processing illicit transactions, and that one of the defendants "communicated frequently with the allegedly fraudulent telemarketers about their return rates." *Id.* There are no comparable assertions here or anything indicating coordination between defendant and SFS beyond that of an ordinary business relationship.

\*\*\*

For the reasons set forth above, the SAC does not allege an association-in-fact enterprise under either theory propounded by plaintiff. *First*, there are no allegations that the numerous and sundry members of the ACH Network share a common fraudulent purpose, and plaintiff has failed to allege that the ACH Network exhibits unity and cohesion. At best, plaintiff has pled a "hub

and spokes" enterprise consisting of defendant and payday lenders that lacks a rim connecting defendant with the other ACH Network participants. *Second*, the Debt Collection Enterprise fails because the SAC does not allege that defendant and SFS formed an ongoing organization and pursued goals on behalf of that integrated entity, as opposed to their own business interests. Thus, plaintiff's substantive RICO claim (Counts 1 and 2 of the SAC) must be dismissed.

### b. Conduct

In addition, even assuming that plaintiff had articulated a cognizable enterprise theory, the SAC would still fail to state a substantive RICO claim because she has not adequately alleged that defendant conducted or participated in the affairs of that enterprise.

"For RICO purposes, simply establishing the presence of an enterprise is not enough. Plaintiffs must also allege that the defendants 'conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *First Capital Asset Mgmt.*, 385 F.3d at 175-76 (quoting 18 U.S.C. § 1962(c)). The Supreme Court has interpreted this statutory language to mean that the RICO defendant must have participated "in the operation or management of the enterprise." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)); *see, e.g.*, *First Capital Asset Mgmt.*, 385 F.3d at 176 (holding that "'one is liable under RICO only if he participated in the operation or management of the enterprise itself'" (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994))). Under this standard, a person may not be held liable merely for taking directions and performing tasks that are "necessary and helpful to the enterprise," or for providing "goods and

services that ultimately benefit the enterprise." *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 451-52 (S.D.N.Y. 2004) (citations omitted). Instead, "the RICO defendant must have played '*some* part in directing [the enterprise's] affairs.'" *First Capital Asset Mgmt.*, 385 F.3d at 176 (quoting *DeFalco*, 244 F.3d at 310) (brackets in original). "In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *Id.* (citations omitted); *see, e.g.*, *AIU Ins. Co. v. Olmecs Med. Supply, Inc.,* No. 04-CV-2934 (ERK), 2005 WL 3710370, at * 8 (E.D.N.Y. Feb. 22, 2005) ("[W]here the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.").

Here, Count 1 of the SAC alleges that

First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Network Enterprise. Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by a Third Party Service Provider acting on the Originator's behalf. First Premier has decision-making authority within the ACH Network Enterprise regarding which Originators to accept or reject into the ACH Network.

(SAC ¶ 110.) In addition, plaintiff claims that defendant "plays a distinct role in the operation, management, and control of the ACH Network Enterprise by participating in the NACHA rule making process . . . ." (*Id.* ¶ 111.) Count 2 of the SAC contains substantially similar assertions with respect to the Debt Collection Enterprise and specifically alleges that "[w]ithout First Premier's participation as an ODFI in the ACH Network and agreement to originate the debit entries initiated by SFS, SFS would be unable to debit the bank accounts of its borrowers in order to collect unlawful debts on illegal payday loans." (*Id.* ¶ 130.)

Defendant argues that, under either theory, plaintiff has alleged nothing more than that First Premier provided financial services to the ACH Network and SFS in furtherance of defendant's own interests, and that such allegations do not satisfy the "conduct" element of a RICO claim. In response, plaintiff contends that the SAC alleges that (1) defendant "conduct[s] and participate[s] in the affairs of the ACH Network Enterprise by using [its] 'gatekeeper' function as [an] ODFI[] to determine which merchants are permitted to originate credit and debit entries on the ACH Network"; and (2) defendant "played an essential role in furthering [the Debt Collection Enterprise] by entering into an agreement with SFS to debit illegal loan debits and then actually initiating the debits." (Pl.'s Opp'n Br. at 13, 19.)

The Court agrees with defendant. Even construing the SAC in a light most favorable to plaintiff, its allegations establish that defendant "merely provide[d] professional services" to both the ACH Network and SFS by (1) originating ACH transactions into the Network; and (2) entering into an agreement with SFS to facilitate ACH transactions. *Sky Med.*, 17 F. Supp. 3d at 224. In contrast, there are no allegations that defendant had any role in devising payday loans or determining which individuals to debit, or that defendant "had any control" over the ACH Network entities or SFS; instead, the SAC states that defendant engaged in "arms length commercial transaction[s]" with those

parties. *Berry v. Deutsche Bank Trust Co. Americas*, No. 07CIV.7634 (WHP), 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008), *aff'd*, 378 F. App'x 110 (2d Cir. 2010).

Courts have routinely and correctly held that such a relationship does not qualify as "conducting or participating" in the affairs of a RICO enterprise, even when the defendant is aware of the enterprise's unlawful activity. *See Azrielli*, 21 F.3d at 521-22 (2d Cir. 1994) (holding that provision of legal services related to fraudulent real estate transaction was not management of RICO enterprise); *Abbott Labs.*, 2017 WL 57802, at *7 ("Even assuming the truth of [the plaintiff's] conclusory allegations that the pharmacies and defendants 'have a long-standing relationship,' no factual allegations suggest that that relationship was other than an arm's-length business relationship between a buyer and a seller. Courts reject such RICO allegations, in which the conduct alleged was taken only for the defendants' benefit, not a separate enterprise's."); *Berry*, 2008 WL 4694968, at *6 ("Lending money to an enterprise does not establish a role in 'directing the enterprise's affairs.'"), *aff'd*, 378 F. App'x 110; *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 431 (S.D.N.Y. 2007) ("Rosner's sole allegation is that BoC provided banking services that aided in the perpetration of the fraudulent scheme. Regardless of how indispensable or essential such services may have been, rendering a professional service by itself does not qualify as participation in a RICO enterprise."); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) ("[I]t is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself."); *Indus. Bank of Latvia v. Baltic Fin.*

*Corp.*, No. 93-CV-9032 (LLS), 1994 WL 286162, at *3 (S.D.N.Y. June 27, 1994) (dismissing RICO claim against bank and individual officers on basis that providing "banking services—even with knowledge of the fraud—is not enough to state a claim under § 1962(c)").

As the Third Circuit observed in a RICO case concerning real estate financing,

> to hold that merely because a lender requires security and approval of aspects of construction, [that] the lender thereby takes 'control' of the project . . . would wreak havoc on the lending industry, for any lender who reasonably wished to protect itself would be forced to run the risk of being sued for the unknown fraudulent acts of its borrowers.

*Dongelewicz v. PNC Bank Nat'l Ass'n.*, 104 F. App'x 811, 817 (3d Cir. 2004). Plaintiff's theory of RICO liability would similarly embroil any bank or credit card company that processed an unlawful, debt-related transaction. Defendant's role as an ODFI may have been essential in enabling the payday loan at issue by allowing SFS to access the ACH Network, but the important role it played does not, without more, constitute "conduct" within the meaning of RICO. *See, e.g.*, *Flexborrow LLC v. TD Auto Fin. LLC*, --- F. Supp. 3d ---, No. 16-CV-6359 (JFB) (ARL), 2017 WL 2609605, at *6 (E.D.N.Y. June 16, 2017); *Rosner*, 528 F. Supp. 2d at 431; *Indus. Bank of Latvia*, 1994 WL 286162, at *3.

With respect to Count 1 of the SAC, plaintiff attempts to distinguish this body of precedent by arguing that defendant had "decision-making functions" within the ACH Network Enterprise and, thus, was a controlling member of that collective, as opposed to an outside service provider. However, that conclusory argument is belied

by the sheer scope of the ACH Network, as discussed above. Notwithstanding that defendant had a role in drafting the NACHA Operating Rules, plaintiff does not claim that defendant oversaw or controlled the conduct of the 10,000 institutions that are members of that association. Further, although NACHA characterizes ODFIs as the "gatekeepers" of the ACH Network, simply providing access to that payment system by originating a transaction does not evince control by defendant of the functions performed by the other independent entities—such as the ACH Operators and RDFIs—who also participate in that system. *See Chi*, 2014 WL 5019917, at *2 ("Simply providing financial services or processing credit card transactions is not enough to establish 'operation or management' of an enterprise."); *Super Vision Int'l, Inc. v. Mega Int'l Commercial Bank Co.*, 534 F. Supp. 2d 1326, 1338 (S.D. Fla. 2008) ("[B]ankers do not become racketeers by acting like bankers.").

As for the Debt Collection Enterprise, both *Parm II* and *Flagg* found that similar complaints failed to allege control, and the Court agrees with their well-reasoned conclusions. *See Parm II*, slip op. at 103-04 ("Here, Plaintiff's non-conclusory allegations simply indicate that Defendant transmitted debits originated at the request of the payday lenders to the ACH Network. Those allegations are not sufficient to show that Defendant engaged in the operation or management of the RICO enterprise."); *Flagg*, slip op. at 21 ("But while the Complaint alleges that [First Premier] and [the payday lender] 'associated together,' had a 'close business relationship,' and that Defendant played a 'distinct role' in the 'operation, management, and control' of their shared enterprise, it makes no specific allegations concerning any association, communication, or collaboration between the

two that would suggest they in fact had a 'business relationship.'")

In sum, because plaintiffs have asserted that defendant only originated transactions into the ACH Network at the behest of SFS, there are no allegations in the complaint that defendant played "*some* part in directing [the] affairs" of either the ACH Network or SFS. *First Capital Asset Mgmt.*, 385 F.3d at 176. Accordingly, plaintiff's substantive RICO claim fails for this independent reason.

c. Conspiracy

In the absence of any viable underlying 18 U.S.C. § 1962(c) claim, plaintiff's RICO conspiracy claims (Counts 3 and 4 of the SAC) pursuant to 18 U.S.C. § 1962(d) must also fail. *See First Capital Asset Mgmt.*, 385 F.3d at 182 ("[B]ecause Plaintiffs did not adequately allege a substantive violation of RICO . . . the District Court properly dismissed Count Six, which alleged a RICO conspiracy in violation of 18 U.S.C. § 1962(d)."); *Abbott Labs.*, 2017 WL 57802, at *9 (dismissing RICO conspiracy claim "because its underlying RICO claims [were] deficient"). Accordingly, the Court dismisses those causes of action.

B. GBL Claim

Plaintiff also asserts a New York State law claim under Section 349 of the GBL (Count 11 of the SAC), which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a); *accord Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995). "A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24,

29, (2000). Under this provision, "the gravamen of the complaint must be consumer injury or harm to the public interest," and, as such, "[t]he critical question . . . is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." *Securitron Magnalock*, 65 F.3d at 264 (citation omitted). "Based on this standard, courts have found sufficient allegations of injury to the public interest where plaintiffs plead repeated acts of deception directed at a broad group of individuals." *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (collecting cases); *see also Jones v. Bank of Am. Nat. Ass'n*, 97 A.D.3d 639, 640 (N.Y. 2d Dep't 2012) ("Under General Business Law § 349 (h), a prima facie case requires a showing that the defendant engaged in a consumer-oriented act or practice that was 'deceptive or misleading in a material way and that [the] plaintiff has been injured by reason thereof.'" (quoting G*oshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002)).

Here, there are no allegations that defendant engaged in any "deceptive or misleading practices," whether directed at the public generally or plaintiff specifically. Indeed, the SAC does not assert any contact between defendant or plaintiff whatsoever, nor are there any assertions that "defendant[] maintained a website, circulated marketing materials, or made other efforts to make misrepresentations to the public generally, or even to a broad group of people." *Marini v. Adamo*, 812 F. Supp. 2d 243, 272 (E.D.N.Y. 2011) (granting summary judgment to defendants on GBL claim). In short, plaintiff's GBL claim does not state a cause of action because she does not allege an "actual misrepresentation or omission to a consumer" by defendant. *Goshen*, 98 N.Y.2d at 325.

Nevertheless, plaintiff argues that "the mere fact that Defendant[] debited Plaintiff's account as if the payday loan[] [was a] legitimate, enforceable transaction[] and not in violation of New York law, was deceptive conduct directed at consumers like Plaintiff." (Pl.'s Opp'n Br. at 31.) However, the New York Court of Appeals rejected a similar argument in *Schlessinger v. Valspar Corp.*, 21 N.Y.3d 166 (2013), where it rebuffed the plaintiff's contention that inserting an unlawful provision into a contract violated Section 349 of the GBL because the defendant "impliedly represented that this provision was valid and thereby engaged in a deceptive act or practice." *Id*. at 172. The Court held that it "cannot fairly be understood to mean that everyone who acts unlawfully, and does not admit the transgression, is being 'deceptive'" within the meaning of the GBL. *Id*. Likewise, although debiting plaintiff's account may imply that the transaction at issue was legal, it does not constitute "deceptive" conduct under the GBL.

Further, as defendant notes, the SAC does not actually allege that First Premier debited plaintiff's account; on the contrary, it states that plaintiff's *own bank* withdrew the funds for the payday loan in response to an ACH instruction sent by defendant on behalf of SFS. (SAC ¶¶ 26-27, 40, 92-96.) Accordingly, plaintiff mistakenly relies on this Court's decision in *Kapsis v. Am. Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430 (E.D.N.Y. 2013), because there, the Court found that the plaintiff had "alleged that [the defendant] engaged in deceptive practices directed not just at him, but also at a large class of similarly situated debtors" based on assertions that the defendant, *inter alia*, "fail[ed] to timely respond to communications sent by debtors, issu[ed] false or misleading monthly statements and escrow projection statements, and refus[ed] to provide detailed accountings to debtors for

sums allegedly owed." *Id.* at 450. In contrast, the SAC does not allege any direct contact between defendant and plaintiff or the general public.

Thus, for these reasons, plaintiff has not stated a claim under Section 349 of the GBL because the SAC does not assert that defendant engaged in conduct that was consumer-oriented and misleading. Accordingly, the Court dismisses that cause of action.

## C. Unjust Enrichment Claim

Finally, Count 9 of the SAC asserts a cause of action for unjust enrichment. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: '(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution.'" *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 471 (E.D.N.Y. 2013) (quoting *Intellectual Capital Partner v. Institutional Credit Partners LLC*, No. 08 Civ 10580(DC), 2009 WL 1974392, at *8 (S.D.N.Y. July 8, 2009)). "Under New York law, unjust enrichment does not require a direct relationship between the parties." *Id.* (citing *In re Canon Cameras Litig.*, No. 05 Civ. 7233(JSR), 2006 WL 1751245, at *2 (S.D.N.Y. June 23, 2006); *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40-41 (N.Y. 1st Dep't 2004) (finding plaintiffs' allegations that defendant's deceptive practices "caused them to pay artificially inflated prices for its products [sufficient for purposes of] stat[ing] a cause of action for unjust enrichment")).

The SAC alleges that defendant (1) "used [its] roles as [an] ODFI[] to originate debit entries on the ACH Network initiated by" payday lenders like SFS; (2) "charged and retained a transaction fee for each debit entry it originated on the ACH Network initiated by" the payday lenders; (3) "received and retained wrongful benefits from Plaintiff . . . in the form of such transaction fees"; and (4) was unjustly enriched as a result of this conduct. (SAC ¶¶ 184-87.) Defendant argues that plaintiff's claims fails because (1) "there are no allegations regarding any relationship between her and either Defendant, much less a relationship that could have caused reliance or inducement by Moss"; and (2) "nowhere does Moss allege that *she* (as opposed to someone else) conferred a benefit upon either Defendant." (Def.'s Mot. Br., ECF No. 126, at 30-31.)

The SAC clearly rebuts defendant's second contention because it states that defendant "derived a benefit through the receipt of fees for [its] origination of debit entries on the ACH Network initiated by SFS . . . *and withdrawn from Plaintiff Moss's account.*" (SAC ¶ 97 (emphasis added).) Accordingly, defendant's reliance on *M+J Savitt, Inc. v. Savitt*, No. 08 CIV. 8535 (DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009), is misplaced because, in that case, the court found that the unjust enrichment claim failed because the plaintiff did not allege that the defendant received any benefit from the loans at issue. *Id.* at *10. Here, plaintiff asserts that the transaction fee First Premier received for processing her payday loan was paid from her own funds.[9]

---

[9] Further, even assuming that the SAC asserted that SFS paid defendant the transaction fee from the money it received from plaintiff (as opposed to defendant receiving the fee directly from plaintiff's bank account), such an allegation would not necessarily be fatal to plaintiff's unjust enrichment claim. *See, e.g.,* *Cox*, 8 A.D.3d at 40-41; *Bildstein v. MasterCard International, Inc.*, 03-CV-9826I (WHP), 2005 WL 1324972, *5 (S.D.N.Y. 2005) (credit card user stated unjust enrichment claim against MasterCard, despite receiving card through an issuing bank).

Further, as plaintiff notes—and as this Court has previously observed—New York law does not require "some of type of direct dealing or actual, substantive relationship with a defendant." *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398, 403 (E.D.N.Y. 2010). Instead, the New York Court of Appeals has said that "the plaintiff's relationship with a defendant [must] not be 'too attenuated'" to support an unjust enrichment claim. *Id.* (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007)). Although defendant is correct that the Court of Appeals has also affirmed dismissal of unjust enrichment claims in cases where the pleadings "failed to indicate a relationship between the parties that could have caused reliance or inducement," *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)), this Court cannot, at this juncture, conclude that plaintiff's payday loan "transaction [is not] one of equitable injustice requiring a remedy to balance a wrong," *Mandarin Trading*, 16 N.Y.3d at 183. Construing the SAC and drawing all inferences therein in plaintiff's favor, plaintiff has asserted that defendant profited at the expense of funds withdrawn from her own bank account. Notwithstanding the absence of any allegations of direct contact between plaintiff and defendant, or that plaintiff knew of defendant's role in processing her payday loan, such an assertion states a plausible claim for unjust enrichment under New York law. *See In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 234 (S.D.N.Y. 2012) (denying motion to dismiss unjust enrichment claim because "despite not having direct dealings (contractual or otherwise) with Defendants, Plaintiffs plausibly conferred some benefit on Defendants, albeit indirectly").

Accordingly, defendant's motion to dismiss is denied with respect to plaintiff's unjust enrichment claim.

## D. Leave to Amend

Plaintiff has requested leave to amend her pleading in the event that the Court dismisses any of her claims. (Pls.' Opp'n Br. at 34.) Federal Rule of Civil Procedure 15(a) provides that a party shall be given leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (finding that leave to amend may be denied based upon the "futility of amendment"). As to futility, "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

It is unclear to the Court that plaintiff can remedy the pleading deficiencies discussed above regarding her RICO and GBL claims. In particular, plaintiff appears unable to allege a cognizable RICO enterprise or that defendant made any misrepresentations to plaintiff or the general public. However, in an abundance of caution, the Court exercises its discretion to grant plaintiff leave to amend her complaint one further time.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendant's motion to dismiss. Plaintiff's RICO New York GBL claims are dismissed for failure to state a cause of action, and the motion is denied with respect to the unjust enrichment claim. Any amended complaint must be filed within thirty (30) days of this Memorandum and Order.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated:    July 7, 2017
          Central Islip, NY

\* \* \*

Plaintiff is represented by Darren T. Kaplan of Darren Kaplan Law Firm, P.C., 1359 Broadway, Suite 2001, New York, New York 10018; Jeffrey Ostrow of Kopelowitz Ostrow P.A., 200 SW 1st Avenue, Fort Lauderdale, Florida 33301; Hassan Zavareei and Jeffrey D. Kaliel of Tycko & Zavareei LLP, 2000 L Street NW, Suite 808, Washington, DC 20036; and John A. Moore, Norman Siegel, and Stephen N. Six of Stueve Siegel Hanson LLP, 460 Nichols Road, Suite 200, Kansas City, Missouri 64112.

Defendant is represented by Barry Werbin of Herrick, Feinstein LLP, 2 Park Avenue, New York, New York 10016; and John C. Elkman, Bryan Freeman, and James P. McCarthy of Lindquist & Vennum, 4200 Ids Center, 80 South 8th Street, Minneapolis, Minnesota 55402.